Willie Albert SMITH, Petitioner,

v.

Morris THIGPEN, Commissioner, Mississippi Department of Corrections; Eddie Lucas, Warden, Mississippi State Penitentiary, et al., Respondents.

Civ. A. No. J83–0573(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

June 13, 1988.

Steven L. Winter, New York City, Robert J. Brantley, Jackson, Miss., for petitioner.

Marvin L. White, Jr., Asst. Atty. Gen., Jackson, Miss., for respondents.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

Willie Albert Smith brings this Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, attacking the judgment of conviction and death sentence entered against him on July 30, 1981, in the Circuit Court of the First Judicial Circuit of Hinds County, Mississippi. For the reasons set out below, the Petition is denied.

Smith was convicted of the murder of Shirley Roberts during the course of a robbery in violation of *Miss. Code Ann.* § 97–3–19(2)(e). Roberts was abducted on the morning of March 15, 1981, from the parking lot of the convenience store where she worked. Smith was arrested near the store about an hour later, driving a car like the one in which Roberts' assailant had been seen. One of Roberts' shoes was found in the car, and her body was found behind Smith's nearby apartment.

The evidence against Smith in this case is overwhelming. Neither at the trial, nor at post-conviction proceedings in state court, nor in this petition has any evidence been put forward which exculpates him. At trial Smith relied for his defense on the insufficiency of the state's evidence and on his own rambling, incoherent and totally implausible alibi.

In this Petition, Smith raises the following principal claims:

   A. The state used perjured testimony.

   B. The state withheld exculpatory evidence.

   C. The state used improper argument at the sentencing portion of the trial by referring to (1) rape and (2) parole.

   D. The state excluded Blacks from the jury.

   E. His trial counsel was ineffective.

   F. The Mississippi death penalty statute is unconstitutional as applied to him.

These principal claims are addressed in separate sections below. In addition to them, Smith's Petition includes numerous other claims for which Smith has not provided legal support in his memorandum of law and which are too ill-defined to summarize here. The state responded to all of those claims by raising the jurisdictional bar of *Miss. Code Ann.* § 99–39–21 because the claims were not raised at trial or on direct appeal. Smith has not demonstrated cause to excuse his procedural default on those claims. The Court therefore finds the claims barred and will not consider them further.

The most substantial claim Smith raises regards the use of perjury by the state. Smith argues that his conviction rests on the in-court identification made by the two witnesses to the abduction and that the state knew those identifications to be perjured. These allegations were fully examined at a post-conviction evidentiary hearing in the Hinds County Circuit Court.

Smith attempts to characterize the state's case against him as dependent entirely on the allegedly perjured testimony. That testimony was, however, only a small part of the case. The bulk of the proof was presented through the testimony of police officers, forensic experts and other witnesses without reliance on the testimony of the eyewitnesses. To place the perjury claim in perspective, the Court presents below a detailed account of the story told by the evidence without reliance on the eyewitness testimony.

### THE CRIME

Shirley Roberts was the manager of Tote–Sum Store No. 6 on Robinson Street in Jackson, Mississippi. She was scheduled to open the store for business at 6:00 o'clock on Sunday morning, March 15, 1981.

Sgt. G.E. Oatis, Supervisor of the night shift of Precinct 2 of the Jackson Police Department, was on duty that morning. About 5:30 Sgt. Oatis stopped at the closed Tote–Sum Store to use the public telephone in the parking lot. Roberts' car was in the lot.

Two young men, Kenneth Thomas and James Wells, drove up while Oatis was there. Thomas got out of the car, approached Oatis and asked if there had been a robbery. Oatis asked what he meant, and Thomas explained that as he and Wells had passed the Tote–Sum Store a few minutes earlier, they had seen a black man forcing a white woman into a red Pinto. Oatis noticed that the chain used to secure the door of the store was lying on the pavement in front of the door although the door itself remained locked. Nearby lay a $20 bill, a set of car keys, and a silver-colored pair of brass knuckles. On the parking lot next to Oatis' patrol car lay a woman's tennis shoe and a pair of eye-glasses with a silver neck chain.

Oatis immediately radioed an alarm. It was 5:40 A.M. The police quickly learned that the car in the lot belonged to Roberts and that she was the manager scheduled to open the store that morning. While other police units responded to search the area for the red Pinto and the missing woman, Sgt. Oatis remained at the Tote–Sum Store, protecting the evidence for the mobile crime lab and awaiting a key to the door.

Shortly after 6:00, Willie Albert Smith was driving a red Pinto on Robinson Street toward Tote–Sum Store No. 6. As he neared the store, he noticed the police cars parked there, made a u-turn in the street and began to drive the other way. Smith testified that he thought the police were checking for drivers licenses and that he turned around because his license was at home and expired and because he had a bag of marijuana in the car.

From the Tote–Sum parking lot, Sgt. Oatis spotted Smith's red Pinto as it approached. Seeing the Pinto make a u-turn and head the other way, Oatis concluded that the driver had turned to avoid him. He pursued and stopped Smith. As he overtook the Pinto, Sgt. Oatis saw Smith lean over to reach under the right-hand seat of the car. Suspecting that Smith had hidden a weapon, Oatis checked under the seat when he stopped the car. He found a woman's tennis shoe. The shoe was an exact mate to the tennis shoe in the parking lot. Oatis placed Smith under arrest.

Smith denied knowing anything about the missing woman, and refused to talk about the shoe. Smith admitted, however, that he had borrowed the car from its owner, Charles McDonald, earlier that morning, and he agreed to lead the police officers to McDonald's house nearby. Smith was handcuffed and placed in Oatis' patrol car. One of Smith's hands was stained with blood.

Charles McDonald's mother admitted the police officers to her house and led them to her son's room. McDonald was in a deep sleep. After the officers waked him, McDonald explained that he had been at a party with Smith the night before, but had returned home and gone to bed at 4:30. Smith had ridden home with him and had asked to borrow the Pinto. McDonald stated that Smith left with the Pinto at 4:30. McDonald let Sgt. Oatis examine the clothes he had been wearing the night before. Sgt. Oatis examined them for tears

or stains, but found nothing suspicious. McDonald's family members confirmed that McDonald had come home and gone to sleep when he said and that the clothes he showed Sgt. Oatis were the ones he had worn the night before. McDonald agreed to lead the police to Smith's house.

Smith lived in a small duplex apartment house about five minutes from Tote–Sum Store No. 6. The building had a small, enclosed porch. The front door of the building was missing; the interior hall was open to the street. The two apartments opened off of the hall. Smith's apartment was unlocked. Fearing for Roberts' safety, the officers immediately entered the apartment. They found Roberts' brown purse and a woman's white sweater lying on Smith's bed. On the floor by the bed they found a padlock with a set of keys, one of which was in the lock, a pair of dress shoes caked with fresh mud, and a pair of khaki pants wiped with mud. The pants were stained with blood. Mud and leaves were on the floor by the back door and in the kitchen.

Just behind the house was an area of heavy, wet mud and a broken down fence. Beyond the fence were woods. About 15 feet behind the house, at a point at which the fence had been trampled down into the mud, Officer Jerry Grice found the beginning of a trail which appeared to have been made by something being dragged. The drag trail began inside the fence and continued on the wooded side through the mud and into the heavy leaves which covered the floor of the woods. Officer Grice followed the drag trail 40 or 50 yards into the woods downhill to a small drainage ditch. Leaves and sticks had been piled in the water, but a human ankle was visible through the leaves. Shirley Roberts' body lay face down in the water under the leaves and sticks. The time was 7:12 A.M. Little more than an hour and a half had passed since Sgt. Oatis had radioed the first alarm.

At trial, Dr. Rodrigo Galvez, the forensic pathologist who performed the autopsy, testified that Roberts had been strangled to death before being placed in the water. Her body bore numerous scratches, abra-sions, and bruises, and on the left side of the head were two wounds which had been made by blows from a blunt instrument.

Charles McDonald, the owner of the Pinto, testified that the evening before the crime Smith had shown him a pair of brass knuckles which resembled the silver-colored pair found at the scene and introduced into evidence. McDonald said that Smith had shown him the brass knuckles before they left for the party and that Smith acted as though he had them at the party:

A. It was the early part of the night. You know, he patted his pocket and said he had them but he didn't pull them out.

*    *    *    *    *    *

A. You know, it was a man came in, you know, and he said: "That man don't like me" and just patted his pocket and said: "Don't worry about it."

(Trial Record at 860–61, 862).

McDonald also testified that he did not see Smith with any money that night. At the time of his arrest, however, Smith had a one hundred dollar bill in the pocket of his pants. Another hundred dollar bill was found in the pocket of the khaki pants which were found in Smith's bedroom and which Smith admitted that he had worn to the party.

Jesse Wilson, who was Roberts' supervisor at the Tote–Sum Store, and Roberts' daughter Renea testified that Roberts had at least two one hundred dollar bills in her purse the weekend of the crime. Wilson explained how he knew:

Q. How much money did she have Saturday morning when you saw her?

A. She had—I know I saw at least one $100 bill plus some other bills in her wallet and if you want to know the reason I saw it, we let employees sign tickets for merchandise that they want in the store and we normally hold it out of their pay checks and I was going to enter it on the reports so it could be held out of her paycheck and she said she would pay it and she dropped her billfold and I

was picking at her about the money she had in her pocket—you know in her purse.

(T.R. 1035–36).

Renea Roberts had also seen the money in her mother's purse the day before the crime:

A. Friday before March 13th I borrowed some money from her and then Saturday morning I got my income check and I cashed it and I was bragging about how much money I had and then she said: "Well, I am rich too. I've got about $300 and something dollars in my purse" and, when I got it cashed I went shopping and then that night before I went to work I put the—I borrowed $5.00 from her and I put the money back in her purse and I noticed that there was at least one folded one-hundred dollar bill but there was some others folded underneath it and there were some 20's not folded in a bank envelope.

Q. So there was more than one $100 bill? Is that right?

A. Right.

(T.R. 1040–41).

Wilson also identified the keys found in Smith's apartment as the store keys issued to Roberts. Renea Roberts identified as her mother's the purse, sweater and tennis shoes.

Edwina Ard, forensic serologist for the Jackson Police Department, testified to the results of blood tests on the stain on Smith's hands and on the khaki pants which Smith had worn to the party. She testified that the swabbings of Smith's hand tested positive for human blood, but the blood was of an insufficient quantity to be typed. Ard stated that she had been able, however, to type the blood found on the khaki pants. She analyzed the blood for four sub-types and compared the results to the analysis of known blood samples from Shirley Roberts and from Smith. The results corresponded exactly to the results obtained for Roberts' blood and were distinctly different from Smith's. She concluded that the blood on the pants could have come from Roberts and could not have come from Smith. She explained that the characteristics identified in Roberts' blood and in the blood on the khaki pants could be expected to occur together in the blood of less than 0.3% of the general population.

Joe Andrews, a forensic scientist specializing in hair and fiber identification with the Mississippi Crime Lab, testified to his analysis of hair samples taken from Smith's bedroom and from pubic combings taken from Roberts' body. He testified that several hairs removed from Smith's bed covers were similar to hairs from Roberts' head. The hairs were similar in diameter and were both dyed the same color. Several pubic hairs removed from the bed and the sweater were caucasian and matched Roberts'. The pubic combings taken from Roberts contained one negroid pubic hair. That hair when examined microscopically was similar to hairs taken from Smith.

Smith, as the only witness called by the defense, presented an elaborate alibi. He admitted that he had been at the party with Charles McDonald the night before the crime and that at the party he had worn the khaki pants and dress shoes which the police found in his apartment. He agreed that he had borrowed McDonald's car about 4:30 that morning. Smith explained his subsequent actions as follows: From McDonald's house he went home, but when he got to his apartment he was surprised to see lights on inside and to hear his radio playing. He immediately became afraid that a prowler was in his apartment, because he believed someone had tried to get into his apartment a few days before. Smith had not been able to lock his apartment since his last girlfriend had moved out and taken his key. Smith knocked on the door, but no one responded. Afraid that someone was inside, he decided not to go into his apartment. Instead he went to his backyard and got some clothes from the line. He returned to the front porch and changed clothes there. He neatly folded the clothes he had worn to the party, including khaki pants, and placed these with

the dress shoes in the hall next to the door of his apartment. He then turned to leave, but suddenly he passed out, falling backwards across the porch, because someone at the party had drugged his drink. He lay passed out on the porch for some time. He woke suddenly later and was startled by someone with an afro hair style going around the side of his house. He got up, ran to his sister's house next door and knocked so he could use the phone. No one came to the door. He then found a piece of cloth, tied the fallen muffler back up under the Pinto and left driving toward town to go to work. At that point he saw the police cars at the Tote–Sum Store and turned around to avoid them. As he turned around he dropped the cigarette he was smoking, and it fell over onto the floorboard on the right-hand side of the car. He was leaning over to pick up the cigarette when Sgt. Oatis stopped him. Sgt. Oatis walked up holding a shoe behind his back, pulled Smith out of the car and placed the shoe in the car. Another officer arrived, saw the shoe and accused Smith of abducting the woman.

Smith went on to explain that there was no mud on his dress shoes and no blood on his khaki pants when he left them on the porch. He stated that the one hundred dollar bill in his pocket belonged to him and that he had been saving the money to buy a car. Smith admitted that he owned a pair of brass knuckles, but he stated that his were black, not silver like those found at the Tote–Sum Store. He denied that he had taken the brass knuckles to the party, explaining that he left them at his apartment on the head of his bed. He denied that anyone had taken a swabbing of a stain on his hand. He stated that the keys to the Pinto were in his pants pocket when he passed out on the porch.

Smith's alibi was implausible and contrived. His testimony was hurried and incoherent. The trial judge reported that Smith was belligerent, hostile and easily provoked. (T.R. 1630).

The foregoing account does not rely on any of the testimony of the two eyewitnesses, Kenneth Thomas and James Wells. Their testimony was not necessary to prove the case against Smith. The evidence was overwhelming without it. Kenneth Thomas and James Wells were, nevertheless, valuable witnesses. They were able to describe the assault on Roberts in detail, and they reported the red Pinto to Sgt. Oatis. The truth of their testimony on those matters is proved beyond question and has not been challenged.

### A. THE PERJURY CLAIM

Smith alleges that the eyewitnesses, Thomas and Wells, lied at trial when they identified him as Roberts' assailant and when they testified to certain details of the assailant's red Pinto. Smith does not challenge the veracity of their testimony on other matters. Smith asserts that it was wrong for the state to solicit the perjured testimony or to allow it to go uncorrected because the state either knew or negligently failed to recognize that the testimony was perjured. To support his allegations of fact, Smith relies principally on recanting statements which he obtained from Thomas and Wells.

#### 1. *Standard for Federal Review*

To obtain a writ of habeas corpus based on his perjury claim, Smith must prove that the presence of perjury at his trial rendered the verdict invalid under "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). It is well established that the knowing use by a state of perjured testimony to obtain a conviction is a deprivation of due process under the Fourteenth Amendment. *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Relying upon *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which held that the government must insure the accurate disclosure of any promises made by the government in return for the testimony of a witness, Smith argues that the merely negligent use of perjury by the state is the equivalent of the knowing use condemned in *Mooney*. The Court rejects Smith's interpretation of *Giglio* for the reasons set out below.

Thomas and Wells are recanting witnesses. Traditionally, recanting witnesses are viewed with extreme suspicion in both state and federal court. *United States v. Adi,* 759 F.2d 404, 407–8 (5th Cir.1985); *United States v. Kearney,* 682 F.2d 214, 219 (D.C. Cir.1982); *Smith v. State,* 492 So.2d 260, 263–65 (Miss.1986). Recanted testimony is treated as new evidence, properly the subject of a motion for new trial. The trial judge is vested with considerable discretion to evaluate both the truth of the testimony and the effect of any perjury on the verdict, and the defendant must carry a heavy burden of proof:

> In this Circuit, a defendant who challenges the trial court's denial of the motion has the burden of showing that: (1) the evidence was discovered following trial, (2) the failure to learn of the evidence was due to no lack of due diligence on the part of the defendant, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, *and* (5) the evidence is such that a new trial will probably produce an acquittal.

*Adi,* 759 F.2d at 407 (discussing the recanted testimony of a government witness). Recanted testimony does not by itself set out a claim of deprivation of the federal right to due process and therefore is not ordinarily cause for constitutional review. *See Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791.

Allegations of prosecutorial misconduct contributing to perjury, on the other hand, set out a constitutional claim, and if proved invoke a much stricter standard of review than that applied to newly discovered evidence. *See United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). The strictest standard of review is reserved for cases in which the state has knowingly used perjured testimony because such conduct is "a corruption of the truth-seeking function of the trial process." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397, 49 L.Ed.2d at 350 (interpreting *Mooney* and related cases). A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...." *Giglio v. United States,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108 (citing *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217, 1222 (1959)). *See also Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349.

The constitutional standard of review for cases of knowing use of perjured testimony by the state is much stricter than the traditional standard of review for recanted testimony. Under the latter even if perjury is proved the verdict should stand unless "a new trial will probably result in acquittal." *Adi,* 759 F.2d at 407. Under the former, however, even if acquittal is unlikely, a new trial is required "if the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108. Smith argues that his trial must be reviewed under the strict, constitutional standard. He argues that eyewitness identifications have such a disproportionate effect on the judgment of a jury that he is entitled to a new trial regardless of the overwhelming evidence against him if the state used a perjured eyewitness identification at his trial.

To invoke the strict standard of review, Smith argues that he may prove that the state "used" perjured testimony by showing that the state was negligent. In other words, he argues, he need only show that the state *should have known* that the testimony was perjured. The Supreme Court decisions in *Mooney* and subsequent cases do not support Smith. The petitioner in *Mooney* alleged

> that the sole basis of his conviction was perjured testimony, which was knowingly used by the prosecuting authorities in order to obtain that conviction, and also that these authorities deliberately suppressed evidence which would have impeached and refuted the testimony thus given against him.

*Mooney,* 294 U.S. at 110, 55 S.Ct. at 341, 79 L.Ed. at 793. Deciding whether the allegation stated a claim, the Supreme Court held that the due process clause of the Fourteenth Amendment

> cannot be deemed to be satisfied by mere notice and hearing if a State has con-

trived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.

*Id.* at 112, 55 S.Ct. at 342, 79 L.Ed. at 794. This holding envisages proof of both actual knowledge and intent on the part of the prosecution. The analysis is not applicable to cases in which the prosecution has no actual knowledge but rather must draw conclusions about a witness' truthfulness from conflicting evidence. The purpose of an adversarial trial is to allow the jury to draw such conclusions.

This principle is recognized by the decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), under which the state is required to disclose favorable evidence to the defense but not to the jury. *Brady* does not require the state to impeach its own witnesses or to refrain from using a witness if there is a reasonable doubt about the truth of some matter to which the witness may testify. The prosecution's duty under the Constitution regarding such testimony should be satisfied if it discloses evidence favorable to the defense as required by *Brady. See Agurs*, 427 U.S. at 111 & n. 19, 96 S.Ct. at 2401 & n. 19, 49 L.Ed.2d at 354 & n. 19.

*Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), does not support Smith's proposition regarding negligence. The case dealt with a special type of testimony: testimony by a government witness about promises made by the government in return for testimony against the defendant.

Smith relies on a single reference to negligence in *Giglio* to support his argument. The reference itself is ambiguous. It could refer either to the failure of the assistant U.S. attorney to report an agreement to his superiors and his associates or to the failure of the government as an entity to correct inaccurate testimony after it was introduced at trial. In either event, the statement, the second in the quote below, is applicable only to the particular circumstances of the case:

*In the circumstances shown by this record,* neither [Asst. U.S. Attorney] Di-Paola's authority nor his failure to inform his superiors or his associates is controlling. Moreover, whether the non-disclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, *for these purposes,* to the Government. [citations omitted].

*Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109 (emphasis added).

*Giglio* is not a case of recanted testimony. The new evidence in *Giglio* was an affidavit by the assistant U.S. attorney who had made the promise, but who was not present at the trial. There is no indication in the opinion that the government witness himself had recanted, and it appears plausible that the witness may have truthfully stated his understanding of his agreement with the government as it had been explained shortly before the trial by the assistant's superior. The United States Attorney filed an affidavit in the case stating that he had met personally with the witness before the trial to emphasize that the witness had *not* been guaranteed immunity. *Id.* at 153, 92 S.Ct. at 765–66, 31 L.Ed.2d at 108. The district court relied on that fact to hold the assistant's promise irrelevant. Reversing, the Supreme Court expressed no opinion about the subjective truthfulness of the government witness and concerned itself instead with the objective accuracy of his testimony:

The heart of the matter is that one Assistant United States Attorney—the first one who dealt with [the witness] Taliento —now states that he promised Taliento that he would not be prosecuted if he cooperated with the Government.

*Id.* Noting that evidence of *any* understanding or agreement would be relevant to a witness' credibility, the court imposed on the government a duty to insure the accurate disclosure of *all* such discussions:

To the extent that this [holding] places a burden on the large prosecution offices,

procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.

*Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108.

The strict rule of *Giglio* is feasible because the information in question is actually in the hands of the prosecution. The challenged testimony described an action taken by the prosecution, that is, the making of a promise in return for testimony. This Court refuses to accept Smith's proposition that the Supreme Court meant to require the prosecution to guarantee similarly the truth or accuracy of all the testimony which it solicits.

Smith has offered no other authority to show that the prosecution's choice of witnesses must be reviewed for negligence. The Court is of the opinion that the proper standard for constitutional review under *Mooney* is whether the prosecution knowingly used false testimony to obtain a conviction. *Mooney*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791.

### 2. No Use of Perjury

■ Applying the holding of *Mooney* to the evidence in the record, the Court finds that the prosecution did not knowingly use false testimony at Smith's trial. As an alternative holding, should the Court's reading of the law prove incorrect, the Court finds in addition that the prosecution did not negligently use false testimony. The prosecution could not and should not have known that Thomas and Wells were lying when they identified Smith, if in fact they were.

Perjury is a matter of sincerity, not of accuracy or probative value. Testimony which is sincerely given may be mistaken in fact. To prove his claim, Smith must prove that the prosecution knew that Thomas and Wells did not believe their testimony when they gave it. At the time of the trial, however, the prosecution had no reason to question their sincerity. The evidence proved unequivocally that Thomas and Wells had seen Roberts' assailant and his red Pinto and that they were able to

describe the attack on Roberts in accurate detail. They were able to describe the assailant's clothing and build. The prosecution had reason to believe that Thomas and Wells might be able to identify Smith.

The evidence in the record confirms that the trial testimony of both Thomas and Wells was accurate in great detail. Thomas has repeatedly described the attack in detail, and those details are corroborated by the evidence found at the scene. At the trial Thomas described what he saw as follows:

A.... Well, we went there and we was coming back—as we was coming down Robinson Street toward Ellis Avenue, this grey car pulled into this Tote–Sum Store and this red Pinto was sitting there parallel to the building, and, as we were coming by, a lady got out of the car, going in her purse, and then walked up to the door and this guy—he was standing outside the Pinto with the door open and he walked from the car toward the lady at the store and she started meeting him—started walking toward him—going in her purse with her head down and he walked up to her and grabbed her around the neck, started trying to drag her to the car and I was telling James to stop the car and he said he wasn't going to stop....

.        .        .        .        .

A. Well, he walked up to her and threw his arm around her neck like this (witness demonstrating) and I couldn't see what he was doing with his hand but he had her—I don't know if he had his hand over her mouth like this or whatever—I couldn't see—but, first, when he grabbed her around the neck and his hand was up there, he had bent down like that and I couldn't see it but he walked like that to his car.

.        .        .        .        .

A. She took about 3 or 4 steps from the door toward him by the time he had met her and he put his arm around her and then took her all the way to the car....

A. She got out of the car and I believe she locked the door and walked straight

to the building and, on the way from the car to the building she was going in her purse, looking for her keys, I imagine, and that's when they walked up to each other and I could see it then.

(T.R. 543, 545, 556). The details described by Thomas were supported by the known circumstances of the case. Thomas correctly saw that Roberts was going to open the store, and the timing and location of the assault as he saw it explains the location of physical evidence found at the scene. Thomas said that Roberts had first gone to the door looking for keys in her purse, and then turned from the door to meet her assailant. That explains why the outer padlock was off, while the door itself was still locked. Thomas said the assailant grabbed Roberts near the door, held her around the neck and dragged her toward his car, explaining why the signs of a struggle—the keys, money, and the brass knuckles—were found near the door while the shoe and her glasses were found on the lot. There can be no doubt that Thomas actually witnessed the assault in great detail. Thomas himself has not denied that fact; he repeated substantially the same details to Smith's private investigators.

Wells obviously saw the attack, too, although he probably could not have seen it as well as Thomas since he was driving on the far side of the car from the attack. Nevertheless, Wells was able to describe the attack in detail in his follow-up statement to the detectives, at the trial, and in the conversation secretly recorded by Smith's investigators.

In light of their detailed knowledge of the events at the Tote–Sum store, the prosecution had no reason to believe that Thomas and Wells would lie about being able to identify Smith. There was no reason for the prosecution to believe that either Thomas or Wells would say more than he knew in order to help the prosecution. The circumstances indicated that Thomas and Wells would only say as much as they had to. Neither Thomas nor Wells had any reason to lie about identifying Smith. They did not know Smith. They were not themselves implicated in the crime. They had received no deals in return for their testimony. On the contrary, they were unwilling witnesses at trial, appearing only because they had been subpoenaed. Wells never wanted to be involved at all. Thomas was willing to help only so far as he felt was necessary, and he did not feel that his presence at trial was necessary. Thomas was urged by his family not to get involved in the trial.

At the trial, both Thomas and Wells were cross-examined at length about the sincerity of their identification of Smith in light of their prior inconsistent statements, and about whether they were pressured by the prosecution to make the identification. Thomas and Wells did not simply deny that they had been influenced. Each explained in very plausible detail why he was able to identify Smith at the trial even though he had never done so before and even though he had told the police and the defense that he could not do so.

Thomas admitted on cross-examination that he had not identified Smith in the police lineup. Thomas insisted, however, that he recognized Smith in the lineup and that he told the district attorney so on the first day of the trial:

Q. Was this man in the police line up?

A. Yes, sir.

Q. Have you told anybody that before?

A. No, sir. Since then, I have.

Q. You have?

A. Yes, sir.

Q. You had told somebody that before?

A. Yesterday.

Q. Yesterday?

A. Yes sir.

Q. When you talked—did you talk to the District Attorney?

A. Yes, sir.

(T.R. 604). Thomas voluntarily explained at length that he deliberately pretended not to be able to identify Smith to avoid having to go to trial, and that he concluded that he had to tell the truth and identify Smith after being subpoenaed to testify under oath at trial:

Q. All right. On July 18 [at an interview with Smith's sisters and the defense attorney's son] you couldn't identify this man, could you?

A. I didn't.

Q. And you had been to the suppression hearing before this man, Jamison Gregg, and the two black ladies [Smith's sisters] came to see you?

A. I believe that was before then. Yeah, that's right.

Q. You had been to the suppression hearing and you had seen him there and up here in the courtroom and on July 18, after the suppression hearing, you couldn't identify him on that date.

A. *Can I say something?*

Q. Anything you want to.

A. *By that time, I could have, but I didn't want to. I felt that with the pressure I was getting from my Mother and my other relatives I felt like after I had done told them that this was the guy in the car—I mean told them about the car— and if they could get whoever it was and get the evidence on him, that's fine. You know, I don't want to be sitting here no more than he wants to be sitting over there, you know.*

Q. All right. But you told the people who visited you on July 18, that you couldn't identify him. Is that right?

A. Right.

Q. But now you are telling us that you could identify him?

A. *At the time I didn't want to have anything else to do with it but, when I got my subpoena, that was it. I knowed that what I had to do, you know, or either I could get back in serious trouble about it.*

Q. Are you telling us that when they visited you on July 18, 1981, at that time you couldn't identify the man?

A. No, sir. I told them I couldn't.

Q. All right.

A. The same thing I told the police at the time of the lineup.

Q. But aren't you telling us this morning that, on July 18 of 1981, you could have identified him, but you didn't want to?

A. Right.

Q. But that's what you told them?

A. Right.

Q. Then you told them a lie, didn't you?

A. Yes, sir.

(T.R. 610–11) (emphasis added). Thomas denied that he had been offered any deal or threatened by the District Attorney's office:

Q. All right. Did anybody discuss with you yesterday the possibility that you might not in the future have to report to the parole officer?

A. No sir. They told me if I came in here lying I would be doing it a whole lot longer.

Q. Okay.

A. After I got through with my 22 years, you know.

Q. They told you if you were lying—if you were lying about anything in this trial.

A. I'm going to jail. Right.

Q. You are going to jail?

A. Right.

Q. They told you that?

A. Yes, sir.

Q. Mr. Peters told you that?

A. No, sir.

Q. Who told you that?

A. I believe it was Lt. Bartlett.

Q. All right. What else did he threaten you with?

A. *He didn't threaten me.*

Q. That was a threat wasn't it?

A. No, sir.

Q. He told you that you were going to jail, didn't he?

A. *He told me that if I perjured myself while I am on probation that I would—that they could give me my time back. That's what he said.*

(T.R. 609–10) (emphasis added).

Like Thomas, Wells admitted on cross-examination that he had previously said he

could not identify Smith. Wells insisted, however, that he recognized Smith in a photo lineup before the trial:

Q. You couldn't identify him when you talked to the police?

A. That's correct.

Q. You couldn't identify him when Mr. Jamison Gregg and the Defendant's two sisters came to see you could you?

A. Correct.

Q. You couldn't identify him then.

A. That's correct.

Q. Mr. Wells, on your oath, tell us whether or not you can identify him this morning or tell us whether or not you are identifying a picture?

A. I don't understand the question.

Q. Are you identifying the Defendant— this man—as the man who was out at the Tote–Sum Store or are you identifying a picture?

A. *I am identifying the man.*

Q. You are identifying the man.

A. Correct.

Q. For the very first time.

A. That's correct.

.    .    .    .    .

Q. All right, I want to ask you how it happens that four months later you can identify someone in court some- one you couldn't identify that morn- ing?

A. *I couldn't describe him but I knowed that his face looked famil- iar, so when I saw the picture again yesterday morning, I knew that that was the man that was driving the Pinto on the parking lot at the Tote–Sum Store.*

(T.R. 647) (emphasis added).

Defense counsel attempted to undermine Thomas' and Wells' testimony by asking them to describe the assailant. Both Thomas and Wells responded by describing physical characteristics such as age, height, complexion, build and hairstyle, which cor- roborated their identification of Smith. Both recalled that the assailant was wear- ing brown or khaki pants. Neither Thomas nor Wells has changed his description of the assailant.

Having heard their testimony at trial, the prosecution had no reason to question Thomas' and Wells' sincerity about their identification of Smith. The two men's ex- planations for their testimony were highly plausible. The trial judge was persuaded at the time that their testimony was true. He continued to believe so even after re- viewing the recanting statements obtained by Smith.

Smith relies principally on recanting statements obtained from Thomas and Wells to prove that their testimony was perjured and that that fact was known to the prosecution. The Court finds that those recanting statements are not credible on these matters for the reasons set out below.

Smith obtained the recanting statements in the course of preparing his petition for habeas corpus. In October 1983, Smith's habeas counsel hired Allen Cowling, a pri- vate investigator, to find Thomas and Wells and question them about their testimony at the trial. One of Cowling's employees, Wil- liam Walker, happened to be an acquain- tance of Wells. Walker sought out Wells and Thomas separately and without reveal- ing his purpose led them to discuss the Smith trial in casual conversation, which Walker secretly recorded. Later Cowling formally interviewed Wells and Thomas separately in his office and with their con- sent recorded portions of those interviews. In both cases, the statements recorded by Cowling dramatically contradict those pre- viously recorded by Walker. Neither Cowl- ing nor Walker, who was also present for the office interviews, questioned Thomas or Wells about those contradictions. Cowling prepared the affidavits in the record from the statements recorded in his office.

The recanting affidavit by James Wells and the statement to Cowling on which it is based are not credible. Wells never want- ed to be involved with the case. He re- fused to stop the car to help Roberts, and he did not volunteer to talk to Sgt. Oatis. When the detectives continued the investi-

gation the following week, Wells refused to return their calls, and when found he at first denied any knowledge of the crime. In the conversation secretly recorded by Walker, Wells admitted that he had witnessed the attack on Roberts, and he described the attack in detail, as he had at the trial. In the subsequent office interview, however, Wells told Cowling that he did not see anything at all himself and was not even aware that Thomas had seen anything until he was contacted by the detectives the next day. Wells' statement to Cowling is completely implausible in light of the substantiated testimony by both Thomas and Sgt. Oatis. The statement is an apparent attempt to avoid having any more to do with the investigation. Smith does not urge that the entire statement be taken as true; he focuses only on the in-court identification.

Like Wells, Thomas told one story when he did not know he was being investigated and another in the office of the private investigator. When secretly recorded by Walker, Thomas did not admit that he had had anything to do with the Smith trial. He told Walker that Wells and another man had witnessed the assault and had testified at the trial. In the office interview, in contrast, Thomas admitted his role and described the assault in detail, as he had at trial, disavowing only his identification of Smith.

Like Wells, Thomas did not want to go to the trial. Thomas explained at the trial that his family pressured him not to become involved and that he thought his testimony was unnecessary. After the trial, he and his mother were confronted by Smith's family in an angry exchange over his testimony.

Both Thomas and Wells watched the trial after they testified and learned of the strength of the case against Smith. In their statements to Smith's investigators both stated that they felt that their testimony at the trial, and especially their identification of Smith, had not been necessary because the case against Smith was so strong. It is apparent from these statements and from the contradictions between the first and second statement taken from each of the men that Thomas and Wells resented having been forced to testify publicly against Smith and that they wished to distance themselves from their testimony. This evidence that Thomas and Wells had reasons to recant which are not trustworthy is typical of the reasons why courts traditionally have treated recanting affidavits with great suspicion and have deferred to the judgment of the trial judge for their evaluation. *See, e.g., United States v. Kearney*, 682 F.2d 214, 220 (D.C.Cir.1982) (affirming the denial without a hearing of a 28 U.S.C. § 2255 petition based on a recanting affidavit).

In light of the contradictions and the conflicting motives apparent in the recanting statements as compared with the substantial accuracy and strength of the trial testimony, this Court agrees with the state trial judge that the recanting statements do not prove that the trial testimony was perjured. At most, the recanting statements prove only that Thomas and Wells had second thoughts about their ability to identify Smith; that they feared and misunderstood the police and prosecuting authorities; that they resented the fact that they had been forced to accuse Smith publicly; and that they wanted to blame their having done so on the police, perhaps to avoid any future role in the case.

The judge who presided over the trial also presided at the hearing ordered by the Mississippi Supreme Court on Smith's allegations of perjury. *In re Smith*, 457 So.2d 911 (Miss.1984) (ordering hearing). At that hearing, both Thomas and Wells refused to testify, exercising their Fifth Amendment right against self-incrimination. Cowling and Walker testified about their conversations with Thomas and Wells and introduced transcripts of the recordings of those conversations. In addition, Smith offered physical evidence to prove that it was impossible for Thomas and Wells to identify Roberts' assailant because of the lighting in the parking lot and their distance from it. William S. Boyd of the Attorney General's Office of the State of Mississippi testified about his interviews with Thomas and Wells, in which both men contradicted

or withdrew parts of the statements they had made to Cowling. The District Attorney and two of his assistants, who had tried Smith, testified about their preparation for the trial. Four police officers testified to statements made by the witnesses during the investigation of the crime, and the entire police record of the investigation was introduced. The entire record of this proceeding, along with a transcript of the trial, were presented to this Court for review.

After the hearing the trial judge concluded that the recanting statements and other evidence failed to establish that Thomas and Wells had lied at the trial. The Mississippi Supreme Court affirmed the trial judge's decision denying relief, finding that the evidence of guilt was overwhelming. *Smith v. State,* 492 So.2d 260 (Miss.1986). The Supreme Court disagreed, however, with the fact finding of the trial judge on the issue of perjury, finding that the identification testimony was perjured. *Id.* at 264.

This Court finds that the record taken as a whole does not fairly support the conclusion of the Mississippi Supreme Court that the in-court identifications were perjured. *See* 28 U.S.C. § 2254(d)(8). Mississippi follows the traditional rule which treats recanted testimony with suspicion and which holds that a trial court's evaluation of recanted testimony should not be set aside unless clearly erroneous. *Riddle v. State,* 413 So.2d 737, 740 (Miss.1982), *cited in Smith,* 492 So.2d at 264. The Mississippi Supreme Court found perjury proved by the fact that Thomas and Wells had not identified Smith before the trial and had recanted since the trial. At the trial, Thomas and Wells were cross-examined at length about their prior inconsistent statements. The trial judge was there to hear that testimony and to observe the demeanor of the witnesses. He presided over the hearing in which Smith and the State introduced evidence regarding the recanting statements made by Thomas and Wells. When the record is considered as a whole, it is impossible to conclude that the trial judge's factfinding was clearly erroneous.

This Court expresses its opinion on the perjury allegations only to place them in perspective. Under the federal standard of review applicable here, it is immaterial whether the identifications were in fact perjury. The question is whether the prosecution knew of the perjury. This Court finds that the prosecution did not and could not have known that the identifications were perjured. The prosecution like the trial judge had good reason to believe the testimony.

### B. WITHHOLDING OF EVIDENCE

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963) the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material...." In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the court reaffirmed that "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380, 87 L.Ed.2d at 489–90 (citing *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 352 (1976)).

Smith argues that he was deprived of due process because the prosecution refused to disclose: (1) information in the police report demonstrating that neither Thomas nor Wells could identify the assailant; and (2) that Kenneth Thomas was a police informant when he testified at trial. Smith argues in addition that the non-disclosure of the police record rendered his suppression hearing inadequate.

#### 1. *The Police Record*

Smith argues that he was entitled to obtain from the police record the signed statements by Thomas and Wells, the line-up report, the reports by the investigating officers, and the notes of the police radio communication calls from the morning of the crime. Smith argues that this information would have been useful in assailing credibility of the eyewitness testimony be-

cause the records omit details to which the witnesses testified at trial. Smith's argument was expressly rejected in the *United States v. Agurs:*

> If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.
>
> Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much.

427 U.S. at 109, 96 S.Ct. at 2400, 49 L.Ed.2d at 353.

The record demonstrates that Smith was provided by the prosecution with the information to which he was entitled and that at the time of trial Smith had been effectively provided with the information in the police report. Smith's pretrial motion for discovery requested "Names and addresses of all witnesses in chief and their statements proposed to be offered by the State of Mississippi at the trial." Smith knew that Thomas and Wells were the eyewitnesses. Smith's representatives had interviewed Thomas and Wells before the trial and knew of the substance of their testimony. Smith knew that Thomas and Wells had not identified him to the police, and Smith obtained statements from Thomas and Wells stating that they could not identify him. No evidence from the police report was suppressed. Smith had the information.

*Brady* requires disclosure of information "favorable" to the defendant. 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. The information in the police record in this case was not favorable. There is no evidence in the police record which suggests that Smith is not guilty. Anyone reading the police record at the time of trial would have reasonably believed that it contained no evidence favorable to Smith. It contained only strong evidence against Smith. Smith could have used the record only as a source of additional prior inconsistent statements to impeach the state's witnesses. The inconsistencies were not apparent before the witnesses testified. The prosecution is not required to disclose his entire file simply because the information may become useful to the defense. *Agurs*, 427 U.S. at 109, 96 S.Ct. at 2400, 49 L.Ed.2d at 353.

### 2. *The Informant*

As the second ground for his suppression claim, Smith asserts that the prosecution suppressed evidence that Kenneth Thomas was a police informant when he testified at the trial even though Smith had specifically requested disclosure of any informants. Smith's discovery motion requested disclosure of the

> identity of any and all confidential informants who depict themselves as eyewitnesses to the event or events constituting the charge against Defendant.

Smith argues that the state chose to ignore the Court's order requiring identification of informants.

Smith relies on evidence which came out at the perjury hearing in state court. At the hearing, William S. Boyd of the Office of the Attorney General of the State of Mississippi took the stand to testify to statements which he had obtained from both Wells and Thomas in 1984 as part of his investigation of the perjury allegations. Boyd testified as follows:

> ... we were having extreme difficulty finding Mr. Thomas. And at that time I asked, or was told, that Mr. Thomas was basically an informant for the Burglary Division of the Jackson Police Department and I asked them or Lt. Tier, who was head of that division at the time, to see if he could find Mr. Thomas for me.

(H.R. 329). Detective David Fondren of the Jackson Police Department, who testified at the hearing about his follow-up interviews with Thomas and Wells during the week after Roberts was murdered, testified that he did not know at that time that Thomas was an informant but that he had heard since the trial that Thomas provided information to some people in the department. (H.R. 520). Fondren testified that Thomas' status could not be documented because the Jackson Police Department did not keep records on informants. (H.R. 521).

In *United States v. Quinn*, 543 F.2d 640 (8th Cir.1976), on which Smith relies, the Eighth Circuit ultimately rejected the defendant's claim because of circumstances similar to these. Quinn was convicted of participating in a conspiracy to bribe a juror. The members of the conspiracy sought to approach the juror through her son, Probst, with whom they happened to be acquainted. Probst had previously served as an informant for the FBI. After being approached about bribing his mother, he called his contact in the FBI to report the attempted crime and subsequently cooperated with the FBI in gathering evidence of the conspiracy. The Eighth Circuit rejected the contention that Probst's prior dealings with the FBI had any relevance to his credibility in the case against Quinn.

> What, if anything, Probst may have done for the Bureau in years prior to 1974 had nothing to do with whether Quinn had attempted to bribe Mrs. Probst or with what Probst did in assisting the Bureau in developing this case.

543 F.2d at 651–52.

No material evidence about Thomas' relationship with the police was suppressed in this case. Thomas was not a confidential informant in the sense intended by Smith's discovery request. His identity as a witness was disclosed. He did not approach Sgt. Oatis as an informer, and he had no special relationship with the investigating officers, who were unaware that he had any special relationship with the police. Thomas was not paid for and did not receive any deals in return for his testimony against Smith. The fact that Thomas had an ongoing relationship with law enforcement, because he was on probation, was brought out and fully explored by the prosecution at the trial. Under the circumstances, additional information about his relationship with the police could not possibly have affected the judgment of the jury.

### 3. *The Suppression Hearing*

■ A Fourth Amendment claim for suppression of illegally obtained evidence may not be raised on habeas if the state "provided an opportunity for full and fair litiga-

tion" of the claim. *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed. 2d 1067, 1088 (1976); *Penry v. Lynaugh*, 832 F.2d 915, 918 (5th Cir.1987). Smith argues that the hearing to suppress the evidence obtained from him and his car at the time of his arrest was not adequate because the unavailability of the police record precluded effective cross-examination of the state's witnesses.

The police record does not, however, prove that Thomas and Wells had not provided Sgt. Oatis with the information to which Sgt. Oatis testified at the suppression hearing. A little over an hour and a half elapsed between the time Thomas first approached Sgt. Oatis and the discovery of Roberts' body. The police reports cannot reasonably be considered to be comprehensive of every statement made or everything observed by the witnesses and officers during that hour and a half.

It is beyond question that Sgt. Oatis had probable cause to stop the red Pinto, regardless of the accuracy of his recollection at the time of the suppression hearing of what Thomas and Wells had told him at the Tote–Sum Store. Thomas and Wells identified the assailant as a black man in a red Pinto. Within 30 minutes of that report, at approximately 6:00 A.M. on a Sunday morning, a time of little traffic, Sgt. Oatis saw a red Pinto returning to the scene of the crime. The Pinto made a u-turn within sight of his patrol car. Sgt. Oatis had more than adequate grounds to stop the Pinto. As he stopped the Pinto Sgt. Oatis saw Smith place something under the right-hand seat of his car. Sgt. Oatis had good reason to suspect that the driver was hiding a weapon. Smith was belligerent when stopped, and he had a blood stain visible on his hand. The arrest of Smith and search of his car were not illegal.

### C. IMPROPER ARGUMENT

#### 1. *Rape*

■ Smith asserts that he was deprived of due process because at the sentencing phase of his trial the prosecution argued that he had sexually abused and raped Rob-

erts. Smith argues that he was thereby sentenced to death for a crime for which he had not been charged and which had not been proven, in violation of the rule of *Presnell v. Georgia,* 439 U.S. 14, 16, 99 S.Ct. 235, 236, 58 L.Ed.2d 207, 211 (1978) (quoting *Cole v. Arkansas,* 333 U.S. 196, 201–02, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948)):

> It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made....

Smith's allegations do not state a claim. The decisions in *Presnell* and *Cole* have no bearing on this case. In both of those cases, state courts had vacated the jury verdict on the capital crime but had affirmed the death sentence anyway. There is no such discrepancy in this case. Smith was properly convicted at the guilt phase of murder committed during the course of a robbery, under *Miss. Code Ann.* § 97–3–19 (2)(e). He was sentenced to death under *Miss. Code Ann.* § 99–19–101(5) after the jury found the aggravating factors of robbery, pecuniary gain and heinousness. Under the Mississippi statute, rape or sexual battery may also be charged as an aggravating factor, but these were not charged against Smith. The prosecution argued the rape allegations apparently in support of the charge that the murder was heinous.

On a writ of habeas corpus, the appropriate standard for review of claims of improper argument by the prosecution is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144, 157 (1986) (*citing Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 436 (1974)). The relevant question, therefore, is whether "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* It is "not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* 477 U.S. at 181, 106 S.Ct. at 2472, 91 L.Ed.2d at 157.

The prosecution's references to the evidence of sexual abuse did not render the sentencing unfair. The verdict of capital murder at the guilt phase of the trial constituted a finding beyond reasonable doubt that the murder had been committed during the course of a robbery, and that verdict is supported by overwhelming evidence. The same charge constituted one of the aggravating factors found by the jury. Only one aggravating factor was necessary, and it cannot be doubted that the jury would have found the aggravating factor of robbery regardless of the injection of the rape argument by the prosecution.

The prosecution's reference to sexual abuse was, moreover, hardly capricious or prejudicial. As Smith admits, the prosecution carefully guarded against any reference to rape at the guilt phase of the trial, repeatedly cautioning its witnesses to avoid any reference to those allegations. The prosecution had to caution them because the evidence of sexual abuse was substantial and apparent to everyone. It is obvious that the motive of this crime was not simply robbery. Roberts was alone in a darkened parking lot early on a Sunday morning when she was accosted. She was nevertheless abducted and taken to Smith's apartment. Her sweater and her purse were found on his bed. Her body was found with her pants unbuttoned, her shirt on inside out and her brassiere pulled out of place. Hairs similar to her head and pubic hair were found on Smith's bed. A negroid pubic hair similar to Smith's was found in her pubic combings. The implications of this evidence were obvious to the jury. The fact that the prosecution articulated the implications at the sentencing could not have prejudiced the jury.

It is irrelevant that rape had not been formally charged as a separate aggravating factor. Federal law does not prevent the use of evidence of rape in support of the especially heinous aggravating circumstance of the Mississippi statute. The Fifth Circuit has held that the failure of the State of Mississippi consistently to define the especially heinous aggravating cir-

cumstance in capital cases does not make the imposition of the death penalty under the Mississippi statute unconstitutional:

> The Mississippi sentencing scheme, even without a limiting construction of the especially heinous aggravating circumstance, meets these constitutional requirements.

*Johnson v. Thigpen,* 806 F.2d 1243, 1247 (5th Cir.1986). The evidence shows that Roberts was abducted, sexually abused and manually strangled to death. The prosecution did not offend the Constitution of the United States by arguing that all of that evidence should be considered to show that the murder was especially heinous, atrocious or cruel, for the limited purpose for which that aggravating factor is used under the Mississippi statutory scheme. *Johnson,* 806 F.2d at 1245–49.

Smith argues incidentally that the evidence of rape rendered the guilt phase of the trial fundamentally unfair. The argument is without merit. Especially in light of Smith's defense, the trial court could not have excluded the evidence of rape because the evidence of rape was inextricable from the evidence of murder.

Smith's only real defense at the trial was that the evidence was insufficient to connect him to the murder. Smith's trial counsel repeatedly referred to the state's failure to find Smith's fingerprints on Roberts' belongings, and he vigorously attacked the state's failure to type the blood found on Smith's hand as a deliberate oversight of a procedure which might have exculpated Smith. Smith himself contrived an alibi to suggest that someone else had been wearing his khaki pants when they were stained with Roberts' blood.

These trial tactics by Smith made necessary the admission of all the evidence to which Smith now objects. The introduction of the hair analysis of Roberts' pubic combings, for example, was probative evidence to connect Smith to Roberts' body. The state introduced photographs of Roberts' body, which showed her clothing out of place, to allow Dr. Galvez to identify the body as the one on which he performed the autopsy in rebuttal to Smith's argument that the body had not been properly identified. Under the circumstances of this case, there was no way to avoid the evidence of sexual abuse without unduly burdening the state's ability to prove murder. The evidence of Smith's guilt on the capital charge was, moreover, so overwhelming that the verdict could not possibly be deemed the result of prejudice.

### 2. *Parole*

■ Smith argues that it was unconstitutional for the prosecutor to suggest that Smith might eventually be paroled if sentenced to life. Smith did not object to these comments at trial or on direct appeal, and the Mississippi Supreme Court held that the argument was procedurally barred. *Smith v. State,* 434 So.2d 212, 216 (Miss.1983). The state procedural bar effectively precludes the claim from federal review. *Edwards v. Thigpen,* 595 F.Supp. 1271 (S.D.Miss.1984). It is apparent, moreover, that the comments did not "so infect the trial with unfairness" as to make the sentence a denial of due process. *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2472, 91 L.Ed.2d at 157.

### D. EXCLUSION OF BLACKS

■ The prosecutor used all 12 of the state's peremptory challenges to strike Blacks from the jury. No objection was made by Smith's counsel. Three members of the jury were black.

Smith argues that the prosecutor's use of the State's peremptory challenges violated *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the controlling precedent at the time of trial and direct appeal. When Smith first raised this claim on his third petition for post-conviction relief, the Mississippi Supreme Court held the issue barred by the failure to object at trial or on direct appeal. *Smith v. State,* 500 So.2d 973, 974–75 (Miss.1986). Smith argues that he can demonstrate "cause" for his failure to follow the procedures and "actual prejudice" from the alleged violation. *Reed v. Ross,* 468 U.S. 1, 11, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1, 12 (1984); *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783, 801 (1982).

As cause Smith asserts that the factual basis for the claim was not available to him at the trial because he did not know that the prosecutor's strikes of Blacks were systematic within the meaning of *Swain.* The factual basis to support the objection arose subsequently, he contends, when the district attorney, Ed Peters, was deposed in connection with *Edwards v. Thigpen,* 595 F.Supp. 1271 (S.D.Miss.1984). Smith asserts that Peters' admissions established a case of systematic exclusion within the meaning of *Swain.*

Peters' statements have already been the subject of two opinions by this Court finding that Peters' statements did not establish violation of *Swain. Edwards v. Thigpen,* 682 F.Supp. 1374 (S.D.Miss.1987); *Evans v. Thigpen,* 683 F.Supp. 1079 (S.D. Miss.1987), *aff'd, Evans v. Cabana,* 821 F.2d 1065 (5th Cir.1987). In *Edwards* the Court conducted a full evidentiary hearing on the allegations and entered extensive findings of fact. The evidence did not establish "an inference that the prosecutor was bent on striking Negroes, regardless of trial-related considerations." *Swain,* 380 U.S. at 225–26, 85 S.Ct. at 838–39, 13 L.Ed.2d at 777. *See Evans,* 821 F.2d at 1067–68. Smith, therefore, cannot show actual prejudice resulting from the alleged violation.

In addition, Smith has not shown sufficient cause for the failure to follow required procedures. Smith knew that the prosecutor exercised all of his strikes against Blacks. It is irrelevant that Smith did not have actual knowledge of Peters' practice in all capital cases. Had he felt himself aggrieved, Smith could have sought to discover that information. Smith is properly barred from raising the claim now.

### E. INEFFECTIVE ASSISTANCE OF COUNSEL

Smith asserts that he was deprived of effective assistance of counsel under the test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2502, 80 L.Ed. 2d 674 (1984). In *Johnson v. Cabana,* 818 F.2d 333, 340 (5th Cir.1987), the Fifth Circuit noted the difficulty with these claims:

This court judicially knows that the representation of a person charged with a capital offense imposes the heaviest professional responsibility known to the practice of law. Common experience and prior precedent demonstrates that collateral review of death penalty verdicts frequently include Sixth Amendment attacks on the effectiveness of previous counsel.

The court noted that effective counsel for these purposes is not "errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." *Id.* at 341 (citation omitted).

The record in this case absolutely refutes Smith's claim of ineffective assistance. Smith's trial counsel demonstrated energy, intelligence, and dedication throughout the proceedings in spite of the overwhelming evidence against his client. No exculpatory evidence has emerged in this case. Smith's habeas counsel has come forward with no evidence inconsistent with Smith's guilt, despite an extensive subsequent investigation. Smith's trial counsel was limited, like habeas counsel, to attacking the sufficiency of the state's evidence. He did so through a detailed cross-examination of almost every witness, consistently pointing out the shortcomings of each variety of evidence. Counsel's performance elicited praise from the trial judge during the trial, and that praise was deserved.

Smith's habeas counsel proposes a litany of errors by Smith's trial counsel in support of this claim. The alleged errors are not sufficient to undermine the reliability of the adversarial proceeding within the meaning of *Strickland.*

### F. CONSTITUTIONALITY OF THE STATUTE

Smith raises three claims regarding the constitutionality of the Mississippi capital punishment statute as applied to him:

1. The statute is applied unfairly to Blacks;

2. Mississippi's use of heinousness as an aggravating factor is not sufficiently limited; and

3. The aggravating factors repeated elements of the underlying offense.

None of these issues was raised at trial or on direct appeal, and they are procedurally barred. The issues are, moreover, precluded as a matter of law. Smith's racial discrimination argument rests upon the sort of statistical evidence rejected by the United States Supreme Court in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). It is established that the broad interpretation given heinousness within the Mississippi statutory scheme is not unconstitutional. *Johnson v. Thigpen*, 806 F.2d 1243, 1245–49 (5th Cir.1986). The Mississippi scheme limits the definition of capital murders sufficiently to satisfy the Constitution. The repetition of elements of the capital offense in the aggravating factors is constitutionally irrelevant. *Id.*

## CONCLUSION

For the reasons set out in this opinion, the Writ is denied. However, the stay of execution previously granted by this Court remains in effect pending this Court's consideration of Petitioner's anticipated application for a certificate of probable cause. *See Johnson v. Cabana*, 818 F.2d 333, 344 (5th Cir.1987). In the event that an appeal from this decision is not taken, this Court will consider, on motion of the State, lifting the stay.